# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2012AP805 & 2012AP840 |
| COMPLETE TITLE: | Scott N. Waller and Lynnea S. Waller, Plaintiffs-Respondents, v. American Transmission Company, LLC, Defendant-Appellant. |

ON BYPASS FROM THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | July 16, 2013 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 10, 2013 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Walworth |
| JUDGE: | James L. Carlson |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | BRADLEY, J., ABRAHAMSON, C.J., dissent. (Opinion filed.) |
| NOT PARTICIPATING: | GABLEMAN, J., did not participate. |

ATTORNEYS:

For the defendant-appellant, there were briefs by *Katherine Stadler*, *Bryan J. Cahill*, and *Godfrey & Kahn, S.C.*, Madison, and oral argument by *Katherine Stadler*.

For the plaintiffs-respondents, there were briefs by *Hugh R. Braun*, *Nicholas R. DiUlio*, and *Godfrey, Braun & Frazier, LLP*, Milwaukee, and oral argument by *Hugh R. Braun*.

There was an amicus curiae brief by *Trevor J. Will*, *Bradley D. Jackson*, *Krista J. Sterken*, and *Foley & Lardner, LLP*, Madison, on behalf of the Wisconsin Utilities Association.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.  2012AP805 & 2012AP840
(L.C. No.  2008CV520 & 2010CV691)

STATE OF WISCONSIN          :        IN SUPREME COURT

**Scott N. Waller and Lynnea S. Waller,**

     **Plaintiffs-Respondents,**

  **v.**

**American Transmission Company, LLC,**

     **Defendant-Appellant.**

**FILED**

**JUL 16, 2013**

Diane M. Fremgen
Clerk of Supreme Court

APPEAL from final judgments of the Circuit Court for Walworth County, James L. Carlson, Judge. *Affirmed.*

¶1  DAVID T. PROSSER, J.  This case is before the court on a petition for bypass of the court of appeals pursuant to Wis. Stat. (Rule) § 809.60 (2011–12).[1]  We are asked to interpret the condemnation procedures in Wis. Stat. § 32.06 and determine the rights of property owners who claim that a taking of property has left them with an "uneconomic remnant."

---

[1] All subsequent references to the Wisconsin Statutes are to the 2011–12 version unless otherwise indicated.

¶2 American Transmission Company, LLC (ATC) condemned a pair of easements on the residential property of Scott and Lynnea Waller (the Wallers) to facilitate the construction and placement of high-voltage transmission lines. The Wallers claimed that the easements diminished the value of their property so much that they were left with an uneconomic remnant. The Wallers contend that they are entitled to certain rights as the owners of property that has substantially impaired economic viability as a result of a partial taking.

¶3 The Walworth County Circuit Court[2] agreed with the Wallers, concluding that their property, after the taking of the easements, was an uneconomic remnant. It ordered ATC to acquire the entire property. The circuit court also awarded the Wallers litigation costs and relocation expenses as "displaced persons" when they moved from the property after the taking.

¶4 The specific issues before this court are as follows:

(1) At what point in a Wis. Stat. § 32.06 condemnation proceeding must a property owner raise an uneconomic remnant claim?

(2) Were the Wallers left with an uneconomic remnant after ATC took two easements on their property?

(3) Are the Wallers entitled to litigation expenses?

(4) Are the Wallers "displaced persons," entitling them to relocation benefits?

---

[2] Judge James L. Carlson, presiding.

2

¶5    We affirm the circuit court and reach the following conclusions.

¶6    First, Wis. Stat. § 32.06(5), the "right-to-take" provision, sets out the proper and exclusive way for a property owner to raise a claim that the owner will be left with an uneconomic remnant after a partial taking by the condemnor.  An uneconomic remnant claim should be brought under § 32.06(5) because the condemnor has failed to include an offer to acquire any uneconomic remnant in the condemnor's jurisdictional offer. The inclusion of an offer to acquire an uneconomic remnant acknowledges the existence of the uneconomic remnant.  The exclusion of such an offer indicates that the condemnor disputes the existence of an uneconomic remnant.  A right-to-take action must be decided promptly by the court and shall not prevent the condemnor from filing a simultaneous valuation petition, proceeding thereon, and taking any property interest whose condemnation is not being directly contested by the owner.  A right-to-take action on an uneconomic remnant claim is designed to protect an owner's right to fair compensation to avoid economic hardship, not to paralyze public interest takings under eminent domain.

¶7 Second, the Wallers' property, after ATC took two easements for transmission lines, is an uneconomic remnant because it is of such size, shape, and condition as to be of substantially impaired economic viability as either a residential or an industrial parcel.  The taking of the two easements drastically reduced the portion of the Wallers'

property not subject to a servitude.  The easements themselves not only restricted the Wallers' activity in the easement area but also substantially diminished the desirability, practicality, and value of the Wallers' property for either a residential or industrial user.

¶8    Third, the Wallers prevailed on their uneconomic remnant claim brought under Wis. Stat. § 32.06(5)——the right-to-take statute——and, therefore, were entitled to litigation expenses under Wis. Stat. § 32.28.

¶9    Finally, the Wallers were displaced persons under Wis. Stat. § 32.19(2)(e)1.a. because they moved "as a direct result" of ATC's jurisdictional offer, and the circuit court's findings of fact on this issue are not clearly erroneous.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

¶10  These consolidated cases[3] come before the court with a long and complicated history; the uneconomic remnant claim alone has been the subject of three proceedings before the circuit court and two appeals before the court of appeals.  We begin with background information on the Waller property, ATC, and the negotiations between the two parties before ATC's jurisdictional offer to acquire the two easements for its transmission lines.  Second, we summarize the Wallers' right-to-take action, along with ATC's simultaneous petition to determine just compensation

---

[3] This petition for bypass is composed of two cases consolidated for purposes of appeal.  The first case, 2008CV520 (No. 2012AP805) is the Wallers' relocation benefits case.  The second case, 2010CV691 (No. 2012AP840) is the Wallers' right-to-take action.

4

for the taking of the easements.  Third, we examine the holding and reasoning in the first court of appeals decision, Waller v. American Transmission Co., LLC, 2009 WI App 172, 322 Wis. 2d 255, 776 N.W.2d 612 (Waller I).  Fourth, we explain the circuit court proceedings after the first remand from the court of appeals.  Fifth, we examine the holding and reasoning in the second court of appeals decision, Waller v. American Transmission Co., LLC, 2011 WI App 91, 334 Wis. 2d 740, 799 N.W.2d 487 (Waller II).  Sixth, we recount the proceedings in the circuit court on the uneconomic remnant issue after the second remand.  Finally, we examine the circuit court's findings and conclusions on the issues of litigation expenses and relocation benefits.

## A. The Waller Property and ATC

¶11  In 1989 the Wallers purchased a 1.5 acre triangular lot in the Town of Delavan in Walworth County.  The property is bounded on the east by Interstate 43, on the north by Mound Road, and on the west by a vacant lot.  The property——zoned A-1 Agricultural——includes a single-family residence, site improvements, landscaping, and outbuildings.

¶12  The Waller property had several encumbrances burdening it before the easements taken by ATC.  First, a transmission line with a 20-foot-wide easement burdened the property along Mound Road on the north before the Wallers purchased the property.  Second, the property was subject to highway setbacks along both Mound Road (25 feet) and Interstate 43 (50 feet).

5

¶13 For almost 20 years, the rural farmette served as the Wallers' home.[4] However, in the years since 1989 the character of the land surrounding the Wallers' property changed. By 2008 nearby land that was once agricultural became an industrial park.

¶14 ATC is a Wisconsin limited liability company and public utility regulated by the Public Service Commission of Wisconsin (the PSC)[5] and the Federal Energy Regulatory Commission. The legislature authorized the creation of ATC and designated it as a "public utility," an electric "transmission company," and a "transmission utility." Wis. Stat. §§ 196.01(5), 196.485(1)(ge), 196.485(1)(i). See also 1999 Wis. Act 9. Wisconsin Stat. § 32.02(5)(b) vests entities like ATC with the power of eminent domain.

¶15 Public utilities may not undertake work on a project like a high-voltage transmission line unless they have obtained the requisite approval from the PSC and the Department of Natural Resources (the DNR). See Wis. Stat. § 196.491(3) (requiring the PSC to issue a certificate of public convenience and necessity before the construction of a "facility" like a

---

[4] The Wallers used their property to raise chickens and turkeys and pasture sheep. The Wallers also had an extensive garden on the property.

[5] The Public Service Commission (PSC) "has jurisdiction to supervise and regulate every public utility in this state and to do all things necessary and convenient to its jurisdiction." Wis. Stat. § 196.02(1). See also Indus. Energy Grp. v. Pub. Serv. Comm'n, 2012 WI 89, ¶26, 342 Wis. 2d 576, 819 N.W.2d 240.

high-voltage transmission line).  Thus, when ATC proposed an upgrade and expansion of an existing transmission line in and around the City of Delavan, the statutes required administrative proceedings before the PSC and the DNR.  One of the proceedings included a public hearing at the PSC in Madison at which Scott Waller testified.  He expressed concern about possible health hazards and impairment of property values resulting from the placement of high-voltage transmission lines affecting two sides of his property.

¶16 Ultimately, on March 30, 2006, the PSC issued ATC a certificate of public convenience and necessity for the utility's project.  The PSC determined that the upgrade and expansion of transmission lines "[would] not have undue adverse impacts on . . . public health and welfare."

¶17 Having received the requisite regulatory approval, ATC proceeded to acquire the land and easements needed to advance the project.  These acquisitions included the easements on the Waller property.

¶18 As explained previously, the Waller property was already burdened by a 20-foot-wide easement from an existing transmission line on the north side along Mound Road, highway setbacks along Mound Road, and highway setbacks along Interstate 43.

¶19 ATC sought to purchase two easements on the Waller property.  The first easement would overlay the existing transmission line easement on the north side of the property, but widen the easement to 45 feet——an extension of 25 feet over

the existing easement.  The second easement would be 45 feet wide and run along the east side of the property——within the 50 foot highway setback from Interstate 43.  In addition, ATC sought to install a large utility pole in the northeast corner of the property to support conductor wires and distribution lines.[6]

¶20  Pursuant to Wis. Stat. § 32.06(2)(a),[7] ATC retained John Rolling (Rolling) of Rolling & Co. to conduct an appraisal

---

[6] The easement authorized ATC to do the following: "Construct, install, operate, maintain, repair, replace, rebuild, remove, relocate, inspect and patrol a line of structures, comprised of wood, concrete, steel or of such material as Grantee may select, and wires, including associated appurtenances for the transmission of electric current, communication facilities and signals appurtenant thereto."

The easement also granted ATC the associated necessary rights to:

> (1) Enter upon the easement strip for the purposes of exercising the rights conferred by this easement.  (2) Construct, install, operate, maintain, repair, replace, rebuild, remove, relocate, inspect and patrol the above described facilities and other appurtenances that the Grantee deems necessary.  (3) Trim, cut down and remove any or all brush, trees and overhanging branches now or hereafter existing on said easement strip.  (4) Cut down and remove such trees now or hereafter existing on the property of the Landowner located outside of said easement strip which by falling might interfere with or endanger said line(s), together with the right, permission and authority to enter in a reasonable manner upon the property of the Landowner adjacent to said easement strip for such purpose.

[7] Wis. Stat. § 32.06(2)(a) provides: "The condemnor shall cause at least one . . . appraisal to be made of the property proposed to be acquired."

of the property.    Rolling concluded that the property's appraised value before the easements was $130,000.[8]  With regard to the  effects of the easements, Rolling wrote:

> We believe there will be an immediate negative effect on residential appeal.  Over one half of the property will be under easement.  The [property] will have major transmission lines along two of its three sides.  The transmission lines will be within 60 [feet] of the house.  A substantial part of the landscaping will have been lost.  Our before analysis suggested a property which was already in transition from improved residential use to vacant industrial lot use.  We believe the installation of the transmission line pole and the lines themselves brings this property to the tipping point from residential appeal toward light industrial appeal.  It is more likely that the next buyer of this property will be an industrial developer rather than a residential user. We conclude that the residential improvements are rendered totally obsolete.  Highest and best use changes from improved residential to vacant industrial land.

Consequently, Rolling concluded that the Waller property's appraised value after the easements was $55,500——a loss of $74,500, or nearly 57 percent loss in value.  Rolling allotted an additional $7,500 to demolish the residential improvements.

¶21 The Wallers retained their own appraisers, Arthur Sullivan and Kurt Kielisch of Appraisal Group One (Group One). Group One concluded that the before-easement value of the property was $132,000, very similar to Rolling's before-easement

---

[8] Of  the  $130,000  before-easement  appraisal,  Rolling allocated $75,500 to value of the land and $54,500 to value of the improvements.

appraised value.  However, Group One came to a very different conclusion on the after-easement value of the Waller property.

¶22 In determining the after-easement value, Group One considered the property use for industrial and residential purposes.  In light of the neighboring industrial land uses, Group One considered the Waller property to have its highest and best use as "vacant for industrial purposes."  However, Group One noted that the property's triangular shape and small size "negatively impact[ed] its desirability as an industrial site at this time."  Thus, Group One concluded that the current improvements "contribute significant value to its ongoing use as a residential property, despite the changing land use and city expansion surrounding it."  In either case, following the encumbrance of the property by two 45-foot-wide easements, the property's use would be restricted further for either industrial or residential purposes.[9]  Altogether, Group One estimated that the easements would cover approximately 0.8 acres of land and would produce in that area a 100 percent loss in value.  Consequently, Group One concluded that:

> Granting [the two easements to ATC] reduces the property owner's right to enjoy their property and utilize it to its fullest use.  Due to the restricted use of the property and the giving up of the right to control the easement area, it is concluded that the

---

[9] In particular, Group One pointed to restrictions on owner usage in the easement area (i.e., inability to build structures, store certain wares, plant trees or shrubs).  Furthermore, the property's size and shape limitations, while already creating development limitations, would be further restricted for either industrial or residential users.

easement area represents a 100% loss of property value to the property owner.

Thus, Group One estimated the after-easement value of the total property to be only $15,500——resulting in a loss of $116,500, or 88 percent of the before easement value.

¶23 Kurt Kielisch later supplemented Group One's initial appraisal, stating his opinion that the Waller property "suffered substantial[ly] impaired economic viability as a result of the taking of the transmission line easement." Mr. Kielisch based his opinion, in part, on the following: ATC's jurisdictional offer indicated a value of $30,500 for the property, reflecting a loss of value of more than 76 percent; the easement area covered more than half of the property; "public perceptions of the dangers of electric magnetic fields"; the appearance and proximity of the high-voltage transmission lines; the highest and best use of the property after the taking would be vacant industrial; and the inability of the parcel to be utilized for industrial purposes in the absence of municipal sewer and water.

¶24 After the Rolling and Group One appraisals, ATC made several offers to the Wallers. See Wis. Stat. § 32.06(2a) (requiring the condemnor, before making a jurisdictional offer, to negotiate personally with a property owner). Initially, on October 8, 2007, ATC offered to acquire only the easements for $49,000. The Wallers rejected that offer. Next, ATC raised its offer for only the easements to $84,600, which the Wallers also rejected. Later, on March 14, 2008, after receiving the Group

One appraisal, ATC again raised its offer for the easements to $99,500. In the alternative, ATC offered to purchase the entire Waller property for $132,000, provided the Wallers waived the right to any relocation benefits. The Wallers rejected that offer as well.

¶25 Finally, on March 20, 2008, ATC made a jurisdictional offer to the Wallers of $99,500 for only the two easements. The Wallers rejected the jurisdictional offer.

B. The First Circuit Court Decision: The Wallers'
Right-to-Take Action and the Just Compensation Proceeding
Initiated by ATC

¶26 On April 25, 2008, the Wallers filed a right-to-take action under Wis. Stat. § 32.06(5). The Wallers did not challenge ATC's right to take the easements. They argued instead that because the proposed easements would cover more than half of their property and render their residential improvements totally obsolete, they would be left with an uneconomic remnant under § 32.06(3m). In short, the Wallers did not argue that the ATC was taking too much, but that ATC was trying to get away with taking too little. The Wallers' complaint claimed that "the proposed acquisition by ATC compels a total acquisition with a guarantee of attendant relocation benefits pursuant to . . . Wis. Stat. § 32.19." Then, raising the stakes, the Wallers asked the circuit court to prohibit the proposed acquisition of the easements until ATC agreed to acquire the entire property and provide relocation benefits.

¶27 Four days after the Wallers filed their right-to-take action, ATC filed a verified petition for condemnation proceedings, pursuant to Wis. Stat. § 32.06(7).[10] ATC asked the circuit court for hearings before the Walworth County Condemnation Commission (the Commission) to determine just compensation for the taking of the easements.[11] At the same time, ATC petitioned the circuit court for immediate possession of the easements pursuant to Wis. Stat. § 32.12(1). The circuit court, Robert J. Kennedy, Judge, granted the petitions, assigning the case to the Commission and allowing ATC to take immediate possession without a hearing.[12]

¶28 The Commission held a hearing on June 11, 2008, on valuation questions to determine an award. Ultimately, the Commission concluded that the fair market value of the Waller

---

[10] 2008GF78, Walworth County, Consolidated Court Automated Program (CCAP). Initially, the Wallers' right-to-take action was consolidated with the two petitions of ATC on just compensation and immediate possession.

[11] ATC's petition for condemnation proceedings and the subsequent award of just compensation became the subject of appeal by the Wallers. Ultimately, the Wallers' appeal of the Commission's award became 2008CV955, the valuation case. The appeals of the right-to-take action and the relocation benefits case implicate the valuation case; however, neither party has appealed the jury verdict in the valuation case, where the jury determined that the value of the Waller property was $38,000.

[12] Shortly after ATC filed its petition for condemnation proceedings and to take immediate possession, the Wallers moved the circuit court for an expedited hearing on their right-to-take action and for a temporary injunction preventing ATC from proceeding on their petitions. The circuit court rejected the Wallers' motion, concluding that there was no reason to prevent ATC from obtaining immediate possession of the easements.

13

property before the taking of the easements was $130,000, that the value was reduced to $40,000 after the taking, and that the Wallers should be awarded $90,000.   The Wallers ultimately accepted this amount from ATC in January 2009 but appealed the Commission's award to the circuit court.

¶29 The circuit court, again presided over by Judge Kennedy, dismissed the Wallers' right-to-take action on November 8, 2008, five months after the Commission finished its valuation.   The circuit court concluded that an uneconomic remnant claim should be decided in a valuation proceeding, not in a right-to-take action.   The Wallers appealed the dismissal of their complaint.

## C. Waller I: The First Appeal

¶30 The sole issue before the court of appeals was "whether the question of the existence of an uneconomic remnant is properly raised in an action under Wis. Stat. § 32.06(5)." Waller I, 322 Wis. 2d 255, ¶10.

¶31 The Wallers argued that Wis. Stat. § 32.06(5) provides the only opportunity for a property owner to challenge a taking on the ground that it was incomplete because it left an uneconomic remnant.  Id., ¶13.   The court of appeals found this argument persuasive in light of the plain language of § 32.06(5) (allowing for challenges for any reason other than just compensation), as well as the statutory scheme.  Id., ¶¶13-16. Although conceding that "an uneconomic remnant seems to require valuation," the court of appeals reasoned that "before compensation can be set, there must be a determination of what

14

is being taken." Id., ¶¶13-14. The uneconomic remnant determination in § 32.06(5) "permits the court and the [condemnation] commission to 'devote full attention' to the crucial issue of just compensation 'without having the deliberation deflected into consideration of collateral procedural matters.'" Id., ¶14 (quoting Rademann v. DOT, 2002 WI App 59, ¶38, 252 Wis. 2d 191, 642 N.W.2d 600). In other words, the property owner must know the "scope of the acquisition before the question of compensation is negotiated." Id.

¶32 The court of appeals also held that a property owner asserting the existence of an uneconomic remnant after a taking "must have the right to contest a condemnation that does not acknowledge an uneconomic remnant." Id., ¶15. The claim of an uneconomic remnant, the court of appeals posited, "is not a meaningless exercise swallowed up in the compensation process," but a property owner's assertion to protect his or her rights. Id., ¶16.

¶33 Therefore, the court of appeals remanded the case to the circuit court, directing it to reinstate the Wallers' right-to-take claim and to determine whether ATC's taking created an uneconomic remnant. "If so," the court of appeals concluded, "ATC is required, under [Wis. Stat.] § 32.06(3m), to make a concurrent offer for the remnant and to provide relocation benefits . . . directed by Wis. Stat. § 32.19." Id., ¶17.

D. Post-Waller I: The Valuation Trial and
Second Decision on the Wallers' Uneconomic Remnant Claim

15

¶34 After remand, the circuit court, with Judge John R. Race presiding over both the right-to-take and valuation cases, chose to postpone a hearing on the uneconomic remnant claim until after the jury's verdict in the valuation appeal.[13]

¶35 The circuit court conducted a three-day jury trial on the Wallers' appeal of the Commission's award of just compensation. The jury concluded the before taking value of the property at $132,000 and an after taking value at $38,000. The resulting just compensation award was $94,000, which the Wallers did not appeal.

¶36 After the valuation jury trial, the circuit court incorporated both the record and the verdict from the jury trial into the recently reinstated right-to-take action by the Wallers. The circuit court found that the Wallers resided in their house for approximately one year after ATC took the easements; that people could still reside in the Waller house; that the property was of sufficient size to allow for meaningful use; and that the property and improvements had substantial value after the taking. Therefore, the circuit court ruled that, as a matter of law, the property after the taking of the easements was not an uneconomic remnant.

---

[13] The Wallers petitioned the court of appeals for a writ of mandamus, arguing that the order of determination chosen by the circuit court violated the court of appeals mandate in Waller v. American Transmission Co., LLC, 2009 WI App 172, 322 Wis. 2d 255, 776 N.W.2d 612 (Waller I). The court of appeals denied the petition, concluding that the circuit court did not violate a plain legal duty mandated in Waller I.

¶37  The circuit court dismissed the Wallers' complaint and the Wallers appealed.

### E. Waller II: The Second Appeal

¶38  Once again, the court of appeals reversed the circuit court.  Waller II, 334 Wis. 2d 740.  The court of appeals held that

> when a property owner properly raises the issue of whether he or she will be left with an uneconomic remnant pursuant to Wis. Stat. § 32.06(3m), a circuit court must first hold an evidentiary hearing under § 32.06(5) to determine whether the remaining parcel is an uneconomic remnant.  A fact finder may not determine just compensation until the circuit court has resolved the full scope of the taking.

Id., ¶2.

¶39  As it did previously in Waller I, the court of appeals acknowledged the difficulty of separating the question of the existence of an uneconomic remnant and the question of value of the remnant.  Id., ¶14.  However, determining the existence of an uneconomic remnant is "not just a question of value——a circuit court must also determine whether the property is 'of substantially impaired economic viability.'"  Id. (quoting Wis. Stat. § 32.06(3m)).  The court of appeals concluded that the circuit court failed to address whether the Waller property was "substantially impaired" as to its economic viability.  Id. Significantly, the court of appeals stated that "the inquiry does not end once the dollar value of the remaining property is determined——a circuit court is also expected to examine whether

17

the partial taking 'substantially impaired [the] economic viability' of the property." Id., ¶15 (alteration in original).

¶40 Thus, the court of appeals reversed and remanded to the circuit court for a hearing consistent with its decision. Id., ¶17. Also, the court of appeals ruled that "[i]f the circuit court finds that the Wallers' property is an uneconomic remnant, the jury's just compensation verdict is vacated." Id.

### F. Post-Waller II: The Third Decision on the Wallers' Uneconomic Remnant Claim and Litigation Costs

¶41 Following the second remand from the court of appeals, the circuit court, Judge James L. Carlson now presiding, held a two-day trial in the right-to-take case on whether an uneconomic remnant existed. The trial was held in November 2011. For the most part, the same witnesses who testified in the valuation trial testified at the right-to-take trial, and the testimony was largely the same.

¶42 At the conclusion of this trial, Judge Carlson ruled that the taking did indeed leave the Wallers with an uneconomic remnant. The circuit court found that the property suffered "substantially impaired economic viability" because: (1) the jurisdictional offer of $99,500 set damages to the property at 76 percent of the agreed upon $130,000 pre-taking value; (2) both appraisers agreed that the taking made the value of the residential improvements obsolete because the highest and best use after taking was vacant industrial land; (3) after the activation of both transmission line, the Wallers experienced regular electronic interference that prompted concern for

18

themselves, their family, and potential buyers; and (4) the removal of shrubbery and trees within the easement "substantially reduced the attractiveness of the site" and eliminated a sound barrier between the home and Interstate 43.

¶43 The circuit court entered final judgment for the Wallers, imposing an additional $47,509.72 on ATC to acquire the entire Waller property and ordering the Wallers to quitclaim the property to ATC. ATC appealed the judgment.

¶44 After an additional two-day hearing, the circuit court awarded the Wallers $211,261.74 in litigation expenses. The court found that ATC conditioned the purchase of all the Wallers' property on whether the Wallers waived any right to relocation expenses. On the basis of this finding, the court determined that ATC failed to negotiate in good faith. The court also ruled that, when a condemnor fails to "resolve the issue of the uneconomic remnant prior to [making the jurisdictional offer]," the cost of litigation shifts to the condemnor. The circuit court determined that both scenarios applied in this case. ATC challenges the award of litigation costs in this appeal.

G. The Relocation Benefits Case

¶45 On December 18, 2008, the Wallers filed a claim with ATC for relocation benefits, which ATC denied. On August 15, 2009, the Wallers moved to a new permanent residence in the Town of Sharon in Walworth County—after the high-voltage transmission lines had been installed and fully charged.

19

¶46 On April 30, 2010, the Wallers filed a complaint with the circuit court claiming the right to recover relocation costs. The circuit court, Judge Carlson presiding, held a one-day trial on the issue on January 25, 2012.

¶47 During the trial, Scott Waller testified that the decision to move resulted from ATC's jurisdictional offer of $99,500 and the report of ATC's appraiser, Rolling, that the easements destroyed the value of the residential improvements on the land. Waller testified further that he and his wife started looking for a new home in February 2008——a month before the jurisdictional offer——and made an offer to purchase their Town of Sharon property the following November.[14]

¶48 Jack Sanderson, a relocation specialist with the Wisconsin Department of Commerce, also testified. Sanderson evaluated the Wallers' claim for relocation benefits. He opined that the Wallers were displaced persons because "their home was no longer safe, decent or sanitary," and that it had "been degraded to an industrial lot." However, Sanderson admitted that he relied on "common sense" and a dictionary definition of "decent" and not on any definition in the administrative code.

¶49 At the conclusion of the trial, the circuit court ruled that the Wallers were displaced persons under Wis. Stat. § 32.19(2)(e)1.a. and entitled to relocation benefits. The

---

[14] On cross-examination, Scott Waller testified that he had considered moving to a new home even before he learned of the transmission line upgrade and expansion, based on a desire for larger property and more building space.

court found that the Wallers sustained $26,350 in costs associated with the acquisition of relocation property and entered judgment in that amount.[15]

¶50 ATC appealed the right-to-take and relocation cases and petitioned this court to bypass the court of appeals. The court granted the petition on January 14, 2013.

## II. STANDARD OF REVIEW

¶51 In this case, the court must interpret various provisions of Wis. Stat. ch. 32's condemnation procedure. Statutory interpretation is a question of law that this court reviews de novo. Weborg v. Jenny, 2012 WI 67, ¶41, 341 Wis. 2d 668, 816 N.W.2d 191 (citations omitted).

¶52 The court also is asked to apply statutory provisions on condemnation to certain facts. The application of a statute to the facts of the case is a question of law that we review de novo. Warehouse II, LLC v. DOT, 2006 WI 62, ¶4, 291 Wis. 2d 80, 715 N.W.2d 213 (citing State v. Reed, 2005 WI 53, ¶13, 280 Wis. 2d 68, 695 N.W.2d 315). As usual, the court benefits from the analyses of the circuit court and court of appeals. Id. (citing State v. Cole, 2003 WI 59, ¶12, 262 Wis. 2d 167, 663 N.W.2d 700). "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the

---

[15] Wisconsin Stat. § 32.19(4)(a) capped relocation benefit costs for the Wallers at a maximum of $25,000, but the circuit court also permitted an additional $1,350 for the cost of moving, pursuant to then-Wis. Admin. Code § COMM 202.54.

opportunity of the trial court to judge the credibility of the witnesses."  Wis. Stat. § 805.17(2).

### III. DISCUSSION

¶53  Before we address the arguments of counsel, we think it is useful to summarize the condemnation process in Wisconsin.

### A. Statutory Overview of the Wis. Stat. ch. 32

### Condemnation Process

¶54  The Fifth Amendment to the United States Constitution provides, in pertinent part: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V.  The Takings Clause of the Fifth Amendment is applied to the states through the Fourteenth Amendment.  Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot., ___ U.S. ___, 130 S.Ct. 2592, 2597, 177 L.Ed. 2d 184 (2010); Chi., Burlington & Quincy R.R. Co. v. Chi., 166 U.S. 226, 239 (1897).  Article I, Section 13 of the Wisconsin Constitution provides, "The property of no person shall be taken for public use without just compensation therefor."  Wis. Const. art. I, § 13.

¶55 A "taking"——or condemnation——of private property for public use requires the award of just compensation under both the United States and Wisconsin constitutions.  E-L Enters. v. Milwaukee Metro. Sewage Dist., 2010 WI 58, ¶21, 326 Wis. 2d 82, 785 N.W.2d 409 (citing Zinn v. State, 112 Wis. 2d 417, 424, 334 N.W.2d 67 (1983); Howell Plaza, Inc. v. State Highway Comm'n, 92 Wis. 2d 74, 80, 284 N.W.2d 887 (1979)).

¶56 As a general rule,[16] condemnation powers in Wisconsin are set out in Wis. Stat. ch. 32, "Eminent Domain." Condemnors are divided into two categories depending on the purpose for which they seek to acquire property. Each category follows a separate procedural track, although the two tracks share many common procedures.

¶57 Condemnors use Wis. Stat. § 32.05, known as the "quick-take" statute,[17] for condemning property related to sewer and transportation projects. Other condemnors utilize Wis. Stat. § 32.06, the "slow-take" statute, which is the "catch-all" for condemnations not covered by § 32.05.

¶58 Wisconsin's condemnation procedures underwent significant revisions in 1959. Ch. 639, Laws of 1959; Falkner v. N. States Power Co., 75 Wis. 2d 116, 120, 248 N.W.2d 885 (1977). Based on the legislative revisions,

> [i]t is apparent that the legislature intended to create two independent proceedings relating to ["catch-all"] condemnation, an owner's action in circuit court under sec. 32.06(5), Stats., and the condemnation proceeding before a judge under sec. 32.06(7). From sec. 32.06(5) it is clear that the two proceedings may go on simultaneously.

---

[16] Exceptions to the general powers and procedures in Wis. Stat. ch. 32 are Wis. Stat. § 157.50 (condemnation powers established for municipalities to acquire land for municipal cemeteries) and Wis. Stat. ch. 197 (acquisition of public utilities by municipal utilities).

[17] "Quick-take proceedings are intended to permit the immediate transfer of possession and title to condemnors while protecting the rights of landowners." 27 Am. Jur. 2d Eminent Domain § 687 (2004) (footnote omitted).

Falkner, 75 Wis. 2d at 120.

1. Who May Condemn, Negotiation Between the Parties, and the Jurisdictional Offer

¶59 Wisconsin Stat. § 32.02 enumerates entities that have the power to condemn private property.  The list includes public utilities such as ATC.  See Wis. Stat. § 32.02(5)(b).  Utilities use the condemnation procedures outlined in Wis. Stat. § 32.06.

¶60 Most condemnations under Wis. Stat. § 32.06 require a determination of the "necessity of taking."  Wis. Stat. § 32.06(1).  For example, utilities secure a certificate of public convenience and necessity, Wis. Stat. § 32.07(1), under Wis. Stat. § 196.491(3).  See also Indus. Energy Grp. v. Pub. Serv. Comm'n, 2012 WI 89, ¶¶26-38, 342 Wis. 2d 576, 819 N.W.2d 240 (describing the process of obtaining a certificate of public convenience and necessity).

¶61 After making a determination of what it needs to take, a condemnor "shall attempt to negotiate personally" with the condemnee (the property owner) for purchase of the property "sought to be taken."  Wis. Stat. § 32.06(2a).  The condemnor must "cause at least one . . . appraisal to be made of the property to be acquired" before the negotiations commence, and the condemnee may also obtain an appraisal "of all property proposed to be acquired."  Wis. Stat. § 32.06(2)(a)-(b).

¶62  If the negotiations are unsuccessful,[18] the condemnor "shall make and serve" a jurisdictional offer to purchase the property sought.  Wis. Stat. § 32.06(3).  The contents of a jurisdictional offer are set out in Wis. Stat. § 32.05(3).  They include a description of the property and "the interest therein sought to be taken," the proposed date of occupancy, and "the amount of compensation offered," including such additional items as relocation benefits.  Wis. Stat. § 32.05(3).

¶63  Immediately following the provision relating to the jurisdictional offer in Wis. Stat. § 32.06(3) is the definitional provision on "uneconomic remnant."  It reads:

> In this section, "uneconomic remnant" means the property remaining after a partial taking of property, if the property remaining is of such size, shape or condition as to be of little value or of substantially impaired economic viability.  If acquisition of only part of a property would leave its owner with an uneconomic remnant, the condemnor shall offer to acquire the remnant concurrently and may acquire it by purchase or by condemnation if the owner consents.[19]

---

[18] If the negotiations are successful, the condemnor must file two documents: a record of the conveyance itself and the certificate of compensation, indicating the identity of persons having an interest of record in the property, the property's legal description, the nature of the interest acquired and the compensation provided. Kurylo v. Wis. Elec. Power Co., 2000 WI App 102, ¶10, 235 Wis. 2d 166, 612 N.W.2d 380 (quoting Wis. Stat. § 32.06(2a)).

For a general discussion of negotiations in eminent domain proceedings, see Ross F. Plaetzer, Comment, Statutory Restrictions on the Exercise of Eminent Domain in Wisconsin: Dual Requirements of Prior Negotiation and Provision of Negotiating Materials, 63 Marq. L. Rev. 489 (1980).

[19] Except for a different title to the subsection, Wis. Stat. § 32.05(3m) contains an identical version of this statute.

Wis. Stat. § 32.06(3m).

¶64 If the property owner fails to accept the jurisdictional offer within the time specified in the statute, the condemnor may petition the circuit court in the county where the property is located to have the county condemnation commission determine the just compensation for the property sought to be taken. Wis. Stat. §§ 32.06(6)–(7), 32.08(5). If the court finds that the condemnor is entitled to condemn any portion of the property, it "immediately shall assign the matter to the chairperson of the county condemnation commissioners" to hold a hearing to determine just compensation. Wis. Stat. §§ 32.06(7), 32.08(6)(a).

2. The Just Compensation Proceeding and Appeal

¶65 The county condemnation commission holds a hearing to ascertain just compensation for the taking of the condemnee's property. Wis. Stat. §§ 32.06(8), 32.08(5). Upon determining just compensation, the commission files a sworn voucher for the compensation with the circuit court; if the court approves the voucher, the condemnor pays the just compensation to the condemnee. Wis. Stat. §§ 32.06(8), 32.08(6)(b). Either party may appeal the commission's award to the circuit court within 60 days of the filing of the commission's award. Wis. Stat. § 32.06(10). Parties may appeal only on issues related to the amount of just compensation and questions of title, "and it shall have precedence over all actions not then on trial." Id. The appeal proceeds as a jury trial unless both parties agree otherwise. Id.

### 3. Right-to-Take Proceedings

¶66 The county condemnation commission hearing provides an opportunity for the condemnee to be heard on the question of just compensation. However, if after the condemnor makes the jurisdictional offer, the condemnee wishes to contest the condemnor's right to take the property "for any reason other than that the amount of compensation offered is inadequate," the condemnee may file a separate right-to-take action with the circuit court. Wis. Stat. § 32.06(5).

¶67 A § 32.06(5) action "shall be the only manner" in which a condemnee may raise "any issue other than the amount of just compensation" or perfection of title for the property described in the jurisdictional offer. Id. A right-to-take action under § 32.06(5) proceeds independently from a condemnation proceeding under § 32.06(7) and a just compensation proceeding under § 32.06(8). Id.

¶68 A trial on the issues in a right-to-take action takes precedence over all other actions in the court except those already on trial. Wis. Stat. § 32.06(5). Nevertheless, the commencement of a right-to-take action does not "limit in any respect" the right of a condemnor to commence condemnation proceedings under § 32.06(7). Id. Both matters may proceed simultaneously. Id.

¶69 If a court "determines that the condemnor does not have the right to condemn part or all of the property described in the jurisdictional offer or there is no necessity for its

taking," litigation expenses[20] may be awarded to the condemnee. Wis. Stat. § 32.28(3)(b).

### B. When Must a Property Owner Raise an
### Uneconomic Remnant Claim?

¶70 The first issue we must consider is when a property owner must raise an uneconomic remnant claim in the condemnation process.  The Wallers argue that an uneconomic remnant claim must be made in a right-to-take proceeding, as expressed in Waller I and Waller II.  ATC, on the other hand, asserts that there is no action for an uneconomic remnant, but if such an action were permitted, the claim should be raised either in a valuation proceeding before the county condemnation commission, or alternatively, in an inverse condemnation proceeding.  See Wis. Stat. § 32.10.

¶71 Determining whether Wis. Stat. ch. 32 allows a property owner to bring an uneconomic remnant claim——and if so, when——requires this court to interpret statutes.  "The purpose of statutory interpretation is to determine what the statute means so that it may be given its full, proper, and intended effect."  Heritage Farms, Inc. v. Markel Ins. Co., 2012 WI 26, ¶26, 339 Wis. 2d 125, 810 N.W.2d 465 (internal brackets and

---

[20] "Litigation expenses" in Wis. Stat. § 32.28(3)(b) means "the sum of costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees necessary to prepare for or participate in actual or anticipated proceedings before the county condemnation commissioners, board of assessment or any court under this chapter."  Wis. Stat. § 32.28(1).

citation omitted).    Statutory interpretation "begins with the language of the statute."  State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (internal quotation marks omitted).    Courts give statutory language its common, ordinary meaning.  Id.  Statutory language is interpreted in the context in which it is used, not in isolation but as part of a whole.  Id., ¶46.  We must construe statutory language reasonably, so as to avoid absurd results. Id.  Legislative history may be relevant to confirm a statute's plain meaning.  Id., ¶51.

¶72 Rules of construction for eminent domain statutes also guide our interpretation of Wis. Stat. ch. 32.   "Because the power of eminent domain under Wis. Stat. ch. 32 is extraordinary, we strictly construe the condemnor's power . . . while liberally construing provisions favoring the landowner, including available remedies and compensation."  TFJ Nominee Trust v. DOT, 2001 WI App 116, ¶10, 244 Wis. 2d 242, 629 N.W.2d 57 (citing Miesen v. DOT, 226 Wis. 2d 298, 305, 594 N.W.2d 821 (Ct. App. 1999)); see also City of Janesville v. CC Midwest, Inc., 2007 WI 93, ¶101 n.11, 302 Wis. 2d 599, 734 N.W.2d 428 (Prosser, J., dissenting); Aero Auto Parts, Inc. v. DOT, 78 Wis. 2d 235, 241, 253 N.W.2d 896 (1977).

¶73 The uneconomic remnant statute, Wis. Stat. § 32.06(3m), became law more than 35 years ago.  § 5, ch. 440, Laws of 1977.   The legislation was the product of the legislature's Special Committee on Eminent Domain (Special Committee), under the auspices of the Wisconsin Legislative

29

Council.  Summary of Proceedings, Spec. Comm. on Eminent Domain, Wis. Leg. Council, Madison, Wis. (Sept. 9, 1977) [hereinafter Spec. Comm. Summary of Proceedings].

¶74  At the September 9, 1977, proceeding of the Special Committee, members considered separate draft legislation on various topics that would eventually lead to several bills, including 1977 Assembly Bill 1077, enacted as Chapter 440 of the Laws of 1977.  See ch. 440, Laws of 1977; Wis. Leg. Council Rep. No. 28 to the 1977 Legislature, Legislation Relating to Eminent Domain, at 3-4, Wis. Leg. Council, Madison, Wis. (1977) [hereinafter Rep. No. 28].  One of the pieces of draft legislation discussed at the September 9 proceeding addressed "uneconomic remnant," creating the current Wis. Stat. § 32.06(3m).  The summary of proceedings indicates that the draft legislation would "allow[] condemnors to acquire uneconomic remnants" and that the draft was based on Section 208 of the Uniform Eminent Domain Code.  Spec. Comm. Summary of Proceedings at 5.[21]

¶75  The National Conference of Commissioners on Uniform State Laws approved the Model Eminent Domain Code in 1974. Model Eminent Domain Code, Prefatory Note, 13 U.L.A. 3 (2002). Section 208, titled "Offer to Acquire Uneconomic Remnant," reads as follows:

---

[21] The National Conference of Commissioners on Uniform State Laws officially changed the Uniform Eminent Domain Code to a Model Act in 1984.  Model Eminent Domain Code, 13 U.L.A. 1 (2002).

(a) If the acquisition of only part of a property would leave its owner with an uneconomic remnant, the condemnor shall offer to acquire the remnant concurrently and may acquire it by purchase or by condemnation if the owner consents.

(b) "Uneconomic remnant" as used in this section means a remainder following a partial taking of property, of such size, shape, or condition as to be of little value or <u>that gives rise to a substantial risk that the condemnor will be required to pay in compensation for the part taken an amount substantially equivalent to the amount that would be required to be paid if it and the remainder were taken as a whole</u>.

Model Eminent Domain Code § 208, 13 U.L.A. 22-23 (2002) (emphasis added). The Special Committee replaced the above emphasized language with the more succinct phrase "substantially impaired economic viability." Spec. Comm. Summary of Proceedings at 5.

¶76 The Comment to subsection (b) of § 208 of the Model Eminent Domain Code lists several examples of "physical" or "financial" remnants after partial takings that would qualify as uneconomic remnants:

Remnants that are totally "landlocked" so that no physical use of the property is practicable; remnants reduced below minimum zoning area requirements where there is no reasonable possibility of a zoning change; remnants in such physical condition as to preclude economically practicable use for any plausible application; and remnants that are of significant potential value only to one or a few persons (e.g., adjoining landowners).

31

Model Eminent Domain Code § 208 cmt., 13 U.L.A. 23 (2002) (citations omitted).[22]

¶77 ATC asserts that this legislative history confirms that the decision to acquire an uneconomic remnant should be determined by the condemnor, and thus, property owners do not have a cause of action for an uneconomic remnant.  In our view, the legislative history does not support this theory.  On the contrary, the legislative history shows that condemnors were given authority to acquire uneconomic remnants, not sole authority to determine whether an uneconomic remnant exists.  If a condemnor fails to acknowledge the existence of an uneconomic remnant by describing it and including an offer for it in the jurisdictional offer——concurrent with its offer for a taking of other property——the condemnee must have some recourse to assert and prove the uneconomic remnant claim.

_____

[22] The various examples of uneconomic remnants in the Comment to § 208 indicate that landlocked parcels are but one of many possible uneconomic remnants.  In their brief, ATC implies that landlocked parcels resulting from partial takings were the impetus behind the wording substitution "substantially impaired economic viability."  We do not agree.

The Summary of Proceedings for the September 9, 1977, meeting of the Special Committee records a single spectator "who referred to a remnant of 30 acres to which there was no access." Summary of Proceedings, Spec. Comm. on Eminent Domain, at 5, Wis. Leg. Council, Madison, Wis. (Sept. 9, 1977).  The spectator asserted that this type of property should also be taken.  Id. While the Summary of Proceedings then shows the committee amended the draft legislation to include the phrase "or of substantially impaired economic viability," we do not agree with ATC's conclusion that the amendment was in reaction to the comments of the spectator in particular, or to landlocked remnants in general.

¶78  A Wisconsin Legislative Council report on the Special Committee's work bears this out.  The report states that, with regard to the uneconomic remnant proposal, "[the legislation] <u>provides landowners with a means of disposing of portions of their property which would be substantially reduced in value</u> by a condemnation project."  Rep. No. 28 at 4 (emphasis added).[23]

¶79  A logical argument can be made that the county condemnation commission is the place to consider compensation for an uneconomic remnant if the existence of an uneconomic remnant has been acknowledged by the condemnor and the condemnor has included an offer to acquire the uneconomic remnant as part of the jurisdictional offer.  But ATC's position is that the condemnor alone decides whether to recognize an uneconomic remnant and that the parties simply fight over the amount of compensation before the county condemnation commission.  We disagree with that analysis.

¶80  Having recognized a property owner's right to bring an uneconomic remnant claim, we turn to the question of when in the condemnation process a property owner should bring that claim.

¶81  We look first to Wis. Stat. § 32.06(3m) to see if it yields any direction or clues:

---

[23] The Comment to § 208 of the Model Eminent Domain Code also provides foundation for the assertion of a claim by the owner of an alleged uneconomic remnant: "[I]f the owner is prepared to sell, but is not willing to agree to the amount of compensation offered, this section authorizes the parties to agree to its acquisition by condemnation proceedings, so that the compensation may be ascertained by the trier of fact."  13 U.L.A. 23, § 208 cmt. (2002).

Definition.    In    this    section,    "uneconomic remnant" means the property remaining after a partial taking of property, if the property remaining is of such size, shape or condition as to be of little value or of substantially impaired economic viability.    If acquisition of only part of a property would leave its owner with an uneconomic remnant, the condemnor shall offer  to  acquire  the  remnant  concurrently  and  may acquire it by purchase or by condemnation if the owner consents.

¶82 The key phrase in this subsection is "the condemnor shall offer to acquire," and the key word is "concurrently."  If the parties have agreed that there is an uneconomic remnant, that the condemnor will acquire it, and that the amount of compensation offered is acceptable, there is no dispute.  Where there is a dispute, the nature of the dispute is exposed in the jurisdictional offer.    If the condemnor makes an offer to acquire the uneconomic remnant as well as an offer on the property sought, the condemnor is conceding that an uneconomic remnant exists, and the dispute is confined to the amount of compensation.    If the condemnor fails to include an offer to acquire the uneconomic remnant in the jurisdictional offer, it is disputing that an uneconomic remnant exists, and the property owner must have a place to raise the issue.

¶83  Wisconsin Stat. § 32.06(5), the right-to-take statute, reads in part: "When an owner desires to contest the right of the  condemnor  to  condemn  the  property  described  in  the jurisdictional offer <u>for any reason other than that the amount of   compensation   offered   is   inadequate</u>,   such   owner may . . . commence an action in the circuit court . . . naming the condemnor as defendant."  (Emphasis added.)  Subsection (5)

continues: "Such an action shall be the only manner in which any issue other than the amount of just compensation or other than proceedings to perfect title . . . may be raised pertaining to the condemnation of the property described in the jurisdictional offer."  Wis. Stat. § 32.06(5) (emphasis added).

¶84  If subsection (5) contained only the first sentence quoted above, there might be reason to resist including an uneconomic remnant claim in a right-to-take action.  But the second sentence refers to "any issue," and when the jurisdictional offer fails to include an offer to acquire the alleged uneconomic remnant, it creates an "issue other than the amount of just compensation."[24]

¶85  Asking the county condemnation commission to order the condemnor to acquire property beyond what the condemnor has sought to take in the jurisdictional offer and beyond what the circuit court has already approved is asking the commission to exceed its statutory authority.  Moreover, if the commission did not exceed its statutory authority, the condemnee arguably would not be able to appeal the uneconomic remnant issue because of the statutory limit on issues that may be appealed.  See Wis. Stat. § 32.06(10).

¶86  The amicus brief filed by the Wisconsin Utilities Association remarks that:

---

[24] The "any issue" language quoted above was part of the Wisconsin Statutes before the enactment of the "uneconomic remnant" provision in 1978.  See Wis. Stat. § 32.06(5) (1975-76).

> There is simply no reason for issues concerning uneconomic remnants to ever be raised in a right-to-take proceeding. Even if a landowner brought a challenge to a condemnation under § 32.06(5) on the grounds that an uneconomic remnant existed because the condemnor took a wider right-of-way than needed, the inquiry would be how wide an easement was needed for utility purposes, not whether a wider easement produced an uneconomic remnant.

The Wisconsin Utilities Association's hypothetical suggests that even though the issue of "uneconomic remnant" might well come up in a right-to-take hearing, the parties would battle over such questions as the necessity of taking so large an easement. We think the existence or non-existence of an "uneconomic remnant" would be integral to the discussion. The present case represents the flip side of the hypothetical: the condemnor, allegedly, has so failed to account for the full impact of its taking of easements on the condemnee's property that the condemnee seeks to require the condemnor to acquire more than the condemnor would like to take. If the condemnee succeeds, the condemnor also may be required to pay the condemnee relocation expenses. Surely these are "issues."

¶87 ATC's position is that any question about uneconomic remnants should be decided by the county condemnation commission irrespective of whether the condemnor has acknowledged the existence of an uneconomic remnant.

¶88 The Wallers' position is that the condemnor must take the uneconomic remnant and pay for it. Wisconsin Stat. § 32.07 is entitled "Necessity, determination of." It reads in part:

> The necessity of the taking shall be determined as follows:

36

(1) A certificate of public convenience and necessity issued under s. 196.491(3) shall constitute the determination of the necessity of the taking for any lands or interests described in the certificate.

. . . .

(3) In all other cases, the judge shall determine the necessity.

Wis. Stat. § 32.07(1) and (3).

¶89 We think it is unlikely that the PSC would decide on the necessity of taking an individual uneconomic remnant when it authorizes a major utility project. Thus, the task of determining the existence of an uneconomic remnant will fall to the circuit court.

¶90 ATC argues that an uneconomic remnant claim should be brought in a condemnation hearing on valuation, but this argument misconstrues the inherent dispute in an uneconomic remnant case. While determining whether an uneconomic remnant exists undoubtedly is related to the total amount owed to a condemnee, it is fundamentally different from a calculation of the fair market value of an easement under Wis. Stat. § 32.09(6g). As Wis. Stat. § 32.06(3m) implies, the question in an uneconomic remnant claim is the extent of the property the condemnor has the right or obligation to acquire. Indeed, if a court finds that a property would become an uneconomic remnant if the condemnor took an easement, the condemnor might not have a right to take the easement without offering to purchase the entire property. See Wis. Stat. § 32.06(3m). Thus, an uneconomic remnant determination is essential in deciding a right to a partial taking like an easement and should, whenever

37

reasonably possible, precede valuation questions. See Arrowhead Farms, Inc. v. Dodge Cnty., 21 Wis. 2d 647, 651, 124 N.W.2d 631 (1963) (stating that under Wis. Stat. § 32.05, procedural issues must be resolved before the matter of just compensation).

¶91 While an uneconomic remnant claim may, arguably, be brought in some cases in an inverse condemnation action, such a process is "unusual." W. Va. Dep't. of Transp. v. Dodson Mobile Homes Sales & Servs., 624 S.E.2d 468, 473 (W. Va. 2005). Further, a property owner may bring an inverse condemnation action under Wisconsin law only if the property in question "has been occupied by a person possessing the power of condemnation and if the person has not exercised the power." Wis. Stat. § 32.10; Kohlbeck v. Reliance Constr. Co., 2002 WI App 142, ¶22, 256 Wis. 2d 235, 647 N.W.2d 277. In this case, an inverse condemnation action would be inappropriate because the Wallers never claimed that ATC was occupying their entire property; they retained ownership interest in the property. Instead, the Wallers argue that ATC's easement substantially impaired the economic viability of their property.

¶92 It is important to stress that the two tracks——the right-to-take action and the valuation proceeding before the county condemnation commission——can proceed simultaneously, and nothing should stop a utility like ATC from getting easements so that projects can move forward, so long as the right of condemnation is not being directly contested. Wisconsin Stat. § 32.06(5) specifically provides that the commencement of an action under that section "shall not prevent a condemnor from

38

filing the [condemnation] petition provided for in [subsection] (7) and proceeding thereon." Utilities like ATC are entitled to an efficient, cost-effective, and timely resolution of their proposed takings. In that vein, a motion for injunctive relief to halt a condemnation proceeding, like the one the Wallers proposed here, is counterproductive and contrary to the intent and spirit of the statutes.

C. Is the Waller Property an Uneconomic Remnant?

¶93 This brings us to the question of whether ATC's taking of the two easements left the Wallers with an uneconomic remnant, that is, "property . . . of such size, shape or condition as to be of little value or of substantially impaired economic viability." Wis. Stat. § 32.06(3m). In our view, the circuit court was correct in its determination that the Wallers were left with an uneconomic remnant.

¶94 Considerable factual findings support the trial court's conclusion that ATC's easements substantially impaired the economic viability of the Waller property.

¶95 The circuit court described the damage to property value that was recognized in both appraisals and in the jurisdictional offer. Rolling's appraisal noted nearly a 57 percent loss in value, while Group One's appraisal determined that the Waller property sustained an 88 percent loss of value. The jurisdictional offer acknowledged a 76 percent decrease in

value from the taking.  These numbers are indicative of substantial economic impairment to the Wallers' small property.[25]

¶96  Other conclusions in both appraisals create a bleak picture.  Rolling's appraisal for ATC noted that the Wallers' property will have major transmission lines along two of its three sides; that the transmission lines will be within 60 feet of the house; and that substantial landscaping will have been lost in the easement area.  Rolling's appraisal acknowledged that the property was already transitioning from improved residential use to vacant industrial use; the installation of the transmission line pole and the lines themselves would tip the property to light industrial, rendering the residential improvements "totally obsolete."

¶97 The Group One appraisal also considered the Waller property to have its highest and best use——after the taking——as "vacant for industrial purposes."  Group One also noted that the Wisconsin Department of Transportation, in its Real Estate Manual for contractors and local governments, indicates that when a partial taking changes a property's highest and best use, the change provides a basis for determining that the property has become an uneconomic remnant.

¶98  However, even for industrial purposes, Group One noted that the property's triangular shape and small size "negatively

---

[25] The existence of an uneconomic remnant will not always turn on the percentage of land or the percentage of value taken by the condemnor.  The existence of an uneconomic remnant almost always turns on the economic viability of what is left after the taking.

impact[ed] its desirability as an industrial site at this time." Furthermore, the lack of municipal sewer and water on the remaining property is a detriment to any potential industrial buyer, and as the court of appeals in Waller II noted, it would cost approximately $41,000 to install the sewer and water——more than the $38,000 in value for the remaining property.

¶99 In either case, the two 45-foot-wide easements restrict the property's use for industrial or residential purposes.

¶100 In conjunction, the two appraisals reveal a picture of a property so dramatically affected by the easements that it has limited residential and industrial use after the taking. In addition, a reduced sound barrier between the residence and Interstate 43 and perceived electromagnetic disturbances that would likely rattle any potential buyer, further diminish the attractiveness and usability of the property. In other words, the size, shape, and condition of the Waller property is of substantially impaired economic viability as either a residential or a light industrial parcel, and it is therefore an uneconomic remnant.

¶101 These factual findings are not "clearly erroneous." See Waller II, 334 Wis. 2d 740, ¶15 ("Whether the remaining property after a partial taking has 'little value' or is 'of substantially impaired economic viability' is a factual question for the circuit court to resolve.").

¶102 ATC claims that the Wallers' property is not an uneconomic remnant because the Wallers could still live on the

property with the addition of the new high-voltage transmission lines and that they in fact did live on the property even after the transmission lines were fully energized. However, ATC confuses habitability with substantial economic impairment. Although it may be objectively possible to remain on the property and continue to live with the new transmission lines, this does not overcome the fact that the property lost a significant amount of its desirability and value and could no longer sustain its previous use as a residential property.

¶103 ATC argues that the property is not an uneconomic remnant because the existence of a habitable home negates the possibility that the property is valueless. To support this proposition, ATC cites Lake Oswego v. Babson, 776 P.2d 870 (Or. Ct. App. 1989) and Spotsylvania County v. Mineral Springs Homeowners Ass'n, No. CL02-391, 2003 WL 21904116 (Va. Cir. Ct. July 18, 2003). However, these cases are distinguishable from the Wallers' situation. In both cases, the court relied on statutes or regulations that defined "uneconomic remnant" as land with no practical value or utility. See Lake Oswego, 776 P.2d at 872-73; Mineral Springs, 2003 WL 21904116 at *3 (defining uneconomic remnant as "unusable"). Thus, the determinative question in these cases was limited to whether a property was valueless. By contrast, Wis. Stat. § 32.06(3m) designates property as an uneconomic remnant if its economic viability has been substantially impaired. This broader definition allows for the conclusion that the Wallers' property

42

constitutes an uneconomic remnant even though it is not valueless.

¶104 In addition, Mineral Springs and another case cited by ATC, New Mexico ex rel. New Mexico State Highway Department v. United States, 665 F.2d 1023 (Ct. Cl. 1981) (per curiam), are factually distinct from the present case in that the property owners themselves objected to the compelled takings and asserted that their remaining properties were not uneconomic remnants. These distinctions are material because——unlike broad constructions favoring landowners——courts interpret the power of condemnors narrowly, especially when a taking goes beyond what is needed for public use. TFJ Nominee Trust, 244 Wis. 2d 242, ¶10; Mitton v. DOT, 184 Wis. 2d 738, 748, 516 N.W.2d 709 (1994) (quoting Falkner, 75 Wis. 2d at 139) ("[N]o more property can be taken than the public use requires.").

¶105 Based on the factual findings, we conclude that it was not clearly erroneous for the circuit court to conclude that ATC's easements have substantially impaired the economic viability of the Waller property and that it is an uneconomic remnant.

### D. Are the Wallers Entitled To Litigation Expenses?

¶106 Whether the Wallers are entitled to litigation expenses turns on an application of Wis. Stat. § 32.28(3)(b), which provides, in relevant part, that "litigation expenses shall be awarded to the condemnee if . . . [t]he court determines that the condemnor does not have the right to condemn

43

part or all of the property described in the jurisdictional offer."

¶107 By the plain language of the statute, if the court determines that the condemnor does not have the right to condemn part or all of the property, then litigation expenses shall be awarded to the condemnee under Wis. Stat. § 32.28(3)(b). The circuit court concluded that ATC had to acquire the entire property if it wanted to condemn the land for the easements. The court held that ATC did not have the right to condemn only the part of the property "sought to be taken" in the jurisdictional offer because that would leave an uneconomic remnant. Given this antecedent determination by the court, it was not error for the court to conclude that the Wallers are entitled to litigation expenses.

¶108 This conclusion finds support in Warehouse II. In Warehouse II, this court held that an owner of condemned property was entitled to litigation expenses under the "right to condemn" language of Wis. Stat. § 32.28(3)(b), where the condemnor had not negotiated its jurisdictional offer in good faith. This court found the statutory language ambiguous, and "liberally construe[d] statutory provisions regarding compensation for eminent domain takings to favor the property owner whose property is taken against his or her will." Warehouse II, 291 Wis. 2d 80, ¶32. Awarding litigation expenses under those circumstances furthered the statutory purposes "to provide more specific and concrete opportunities to recover litigation expenses for condemnees with legitimate challenges to

44

the actions of condemnors" and "to discourage a condemnor from making a low-ball offer to save money." Id., ¶¶33-34. Here, like the plaintiffs in Warehouse II, the Wallers seek to recover litigation expenses under Wis. Stat. § 32.28(3)(b) for a legitimate challenge to the condemnation actions of ATC. The statute should be liberally construed in the same manner, and the Wallers are entitled to litigation expenses.

¶109 ATC argues that no statutory basis exists to award litigation expenses because ATC negotiated in good faith. Even if "good faith negotiation" would preclude an award of litigation expenses——which was not the holding of Warehouse II—— whether ATC negotiated in good faith is a factual issue best addressed by the circuit court. It should be noted, however, that although ATC did offer to acquire the Wallers' entire property for the full amount of the Wallers' appraisal, that offer was conditioned upon the Wallers' waiver of relocation benefits, which the Wallers successfully sought in circuit court. Moreover, the offer was not included as part of the jurisdictional offer. These facts weigh against a finding that ATC negotiated in good faith.

¶110 ATC argues also that awarding litigation expenses does not advance the purposes of Wis. Stat. § 32.28(3)(b). ATC correctly points out that the purpose of the statute is to make the landowner whole and to discourage condemnors from shortchanging landowners. ATC claims that the Wallers would have been made more than whole by accepting its offer of $132,000 for the whole property or the jurisdictional offer for

45

the easement for $99,500.  However, this claim ignores the fact that ATC's offer for the entire property was conditioned on the Wallers' waiver of relocation benefits, to which the circuit court held the Wallers are entitled.  Because the Wallers could have been made whole only by a jurisdictional offer that included relocation benefits, accepting ATC's offer would have shortchanged the Wallers, and awarding litigation expenses furthers the purposes of the statute.[26]

E. Are the Wallers "Displaced Persons" and Entitled
to Relocation Benefits?

¶111 Wisconsin Stat. § 32.19, titled "Additional items payable," provides for payments to persons displaced by public projects.  The declaration of purpose in Wis. Stat. § 32.19(1) provides, in part, that:

> The legislature declares that it is in the public interest that persons displaced by any public project be fairly compensated by payment for the property acquired and other losses hereinafter described and

---

[26] The dissent professes fidelity to the text of the condemnation statute, see Dissent, ¶162, without acknowledging the usual disparity in resources between the condemnor and condemnee and the broad policy contained in the condemnation statute to ameliorate this disparity.

A condemnee is entitled to just compensation.  A condemnee will not be made whole if the condemnee is forced to litigate the issue of just compensation at great expense and then subtract his or her attorney fees from an award of full value. See Standard Theatres, Inc. v. DOT, 118 Wis. 2d 730, 744, 349 N.W.2d 661 (1984).  A condemnor has no incentive to reach a fair settlement with a condemnee if the condemnor is convinced that it can prevail by outspending and outlasting the weaker adversary.  Wisconsin Stat. § 32.28(3) exists to address this imbalance of power between the condemnor and the condemnee.

46

suffered as the result of programs designed for the benefit of the public as a whole; and the legislature further finds and declares that, notwithstanding subch. II, or any other provision of law, payment of such relocation assistance and assistance in the acquisition of replacement housing are proper costs of the construction of public improvements.

¶112 Wisconsin Stat. § 32.19(3) provides that a condemnor shall make relocation benefit payments to "displaced persons." A displaced person is:

[A]ny person who moves from real property or who moves his or her personal property from real property:

a. As a direct result of a written notice of intent to acquire or the acquisition of the real property, in whole or in part or subsequent to the issuance of a jurisdictional offer under this subchapter, for public purposes; or

b. As a result of rehabilitation, demolition or other displacing activity, as determined by the department of administration, if the person is a tenant-occupant of a dwelling, business or farm operation and the displacement if permanent.

Wis. Stat. § 32.19(2)(e)1. Disputes about relocation benefits must be brought in separate actions under Wis. Stat. § 32.20.

¶113 Because the Wallers did not move as a result of "rehabilitation, demolition, or other displacing activity" as articulated in subparagraph b., the Wallers are "displaced persons" only if they moved "as a direct result" of the jurisdictional offer under subd. para. a.

¶114 Determining whether a person moved from real property "as a direct result" of a written notice of the acquisition——i.e., a jurisdictional offer——requires a factual inquiry into the cause of the person's move.    See    Wis.    Stat.

47

§ 32.19(2)(e)(1)a.    Factual findings will be affirmed unless clearly erroneous.    Wis. Stat. § 805.17 (2); Emp'rs Ins. of Wausau v. Jackson, 190 Wis. 2d 597, 613, 527 N.W.2d 681 (1995).

¶115 The Wallers lived on their property for almost 20 years before ATC made its jurisdictional offer in March 2008. Though ATC offered to purchase the Wallers' entire property for $132,000——approximately the full amount of the Wallers' appraisal——the Wallers refused that offer because it was conditioned on a waiver of their relocation benefits.    Although the Wallers had listed their house for sale in 2005, there is no evidence that the Wallers conducted a search for replacement property until Spring 2008, when ATC made its jurisdictional offer.    Based on these facts, Judge Carlson's finding that the Wallers' move was a "direct result . . . in whole or in part" because of ATC's jurisdictional offer is not clearly erroneous.

¶116 ATC argues that the Wallers are not "displaced persons" because they chose to move voluntarily and were not "forced" to move.    The Wallers do not dispute that they could have continued to live on the property after the installation of the transmission line or that they decided to move before they received Rolling's 2007 appraisal.    However, the statute contains no explicit requirement that a person's move must be "forced" or involuntary in order to render that person "displaced."

¶117 If the legislature intended to provide for relocation benefits only for persons who were "forced" to move, it could have done so.    Indeed, the second alternative definition of

48

"displaced person" in Wis. Stat. § 32.19(2)(e)(1)b. explicitly provides that a "displaced person" is one whose move is prompted by "rehabilitation, demolition, or other displacing activity." This definition of "displaced person" is an alternative to subd. para. a., which contains no reference to the physical condition or habitability of the condemned property, and instead defines "displaced person" in terms of "direct" causation.

## IV. CONCLUSION

¶118 We conclude the following.  First, Wis. Stat. § 32.06(5), the "right-to-take" provision, sets out the proper and exclusive way for a property owner to raise a claim that the owner will be left with an uneconomic remnant after a partial taking by the condemnor.  An uneconomic remnant claim should be brought under § 32.06(5) because the condemnor has failed to include an offer to acquire any uneconomic remnant in the condemnor's jurisdictional offer.  The inclusion of an offer to acquire an uneconomic remnant acknowledges the existence of the uneconomic remnant.  The exclusion of such an offer indicates that the condemnor disputes the existence of an uneconomic remnant.  A right-to-take action must be decided promptly by the court and shall not prevent the condemnor from filing a simultaneous valuation petition, proceeding thereon, and taking any property interest whose condemnation is not being directly contested by the owner.  A right-to-take action on an uneconomic remnant claim is designed to protect an owner's right to fair compensation to avoid economic hardship, not to paralyze public interest takings under eminent domain.

¶119 Second, the Wallers' property, after ATC took two easements for transmission lines, is an uneconomic remnant because it is of such size, shape, and condition as to be of substantially impaired economic viability as either a residential or an industrial parcel. The taking of the two easements drastically reduced the portion of the Wallers' property not subject to a servitude. The easements themselves not only restricted the Wallers' activity in the easement area but also substantially diminished the desirability, practicality, and value of the Wallers' property for either a residential or industrial user.

¶120 Third, the Wallers prevailed on their uneconomic remnant claim brought under Wis. Stat. § 32.06(5)——the right-to-take statute——and, therefore, were entitled to litigation expenses under Wis. Stat. § 32.28.

¶121 Finally, the Wallers were displaced persons under Wis. Stat. § 32.19(2)(e)1.a. because they moved "as a direct result" of ATC's jurisdictional offer, and the circuit court's findings of fact on this issue are not clearly erroneous.

*By the Court.*—The judgments of the circuit court are affirmed.

¶122 MICHAEL J. GABLEMAN, J., did not participate.

¶123 ANN WALSH BRADLEY, J. *(dissenting).* The majority has transformed what should be a case of minor statewide impact involving only a small amount of money into a case with significant ramifications and costly consequences for ratepayers and taxpayers who end up paying the bills.

¶124 The ramifications will affect how all condemnors throughout the state proceed with the taking of property for projects, large and small.[1]

¶125 Because the majority rewrites and broadens the statutory definition of an uneconomic remnant, condemnors may now be required to take an increased amount of property that they do not want or need for their projects. Increased costs to ratepayers and taxpayers will accompany these unnecessary takings because now condemnors can be required to pay for the

---

[1] As ATC warned before the circuit court, the ramifications of this case extend far beyond this relatively small dispute. The importance of this case was described by ATC's attorney on the record:

> The value is small in this case. But the implications of it are enormous not just for ATC but for the Department of Transportation and every other condemnor in the state . . . if there were a finding that this small amount of visual and noise w[as] enough to render this an uneconomic remnant, you'll have uneconomic remnants in all sorts of cases. You'll have to buy the entire property, you'll have to provide all the relocation benefits, and we don't think that's anything like what the legislature intended.

In essence, this case has the potential to spawn a cottage industry of uneconomic remnants.

1

entire property, together with relocation benefits, rather than paying for the taking of only an easement.

¶126 In concluding that the right-to-take proceeding is the only way to bring an uneconomic remnant claim, the majority rewrites another statute. Rather than following the clear words of the right-to-take statute, the majority creates a process with concurrent dual proceedings which has the potential for conflicting valuations and procedural quagmires. The majority's process of dual proceedings contravenes the legislative purpose of the condemnation statutory scheme, which is to promote efficient and cost-effective condemnation procedures.

¶127 Likewise, because the majority rewrites what it initially acknowledges as the clear language of a third statute, the litigation expense statute, it awards out-of-proportion litigation expenses of $211,261.64 for a case involving only a few thousand dollars difference in value.

¶128 Our task when interpreting statutes is to discern the statute's meaning, which we presume is expressed in the language of the legislature. Richards v. Badger Mut. Ins. Co., 2008 WI 52, ¶20, 309 Wis. 2d 541, 749 N.W.2d 581. In applying the words of the statutes written by the legislature, I conclude that a valuation proceeding under Wis. Stat. § 32.06(7) is the proper proceeding to bring an uneconomic remnant claim. Furthermore, I determine that the Wallers' property is not an uneconomic remnant as it is defined by Wis. Stat. § 32.06(3m) and that the Wallers are not entitled to litigation expenses or relocation benefits. Accordingly, I respectfully dissent.

2

I

**A. The majority rewrites Wis. Stat. § 32.06(3m), the uneconomic remnant statute.**

¶129 The majority rewrites the statutory definition of an uneconomic remnant. It describes the remnant here as "the Wallers' property," leaving the impression that the remnant is the entire property rather than a remaining piece of the property. Majority op., ¶7.

¶130 Basing its analysis on a percentage formula (57%, 88%, and 76%), the majority opines that the percentage losses in value illustrate "substantial economic impairment" to the property. Id., ¶95. In addition to considering the percentage losses to the property's value, it states that the Waller property is an uneconomic remnant because the easements "diminished the desirability, practicality, and value of the Wallers' property." Id., ¶7.

¶131 Such an analysis rewrites the uneconomic remnant statute. The text of Wis. Stat. § 32.06(3m), which sets forth a definition of an uneconomic remnant, provides in relevant part:

> (3m) Definition. In this section, "uneconomic remnant" means the property remaining after a partial taking of property, if the property remaining is of such size, shape or condition as to be of little value or of substantially impaired economic viability.

¶132 The majority rewrites Wis. Stat. § 32.06(3m) in two ways. First, it appears to rewrite the statutory phrase "property remaining" to mean an entire property. Second, it rewrites the statutory phrase "substantially impaired economic

3

viability" to mean "diminished desirability, practicality, and value."

¶133 In essence, to fit the facts of this case, the majority rewrites Wis. Stat. § 32.06(3m) as follows:

(3m) Definition. In this section, "uneconomic remnant" means the **entire** property ~~remaining after a partial taking of property~~, if the property ~~remaining~~ is of such size, shape or condition as to be of little value or of ~~substantially impaired economic viability~~ **diminished desirability, practicality, and value**.

(additions are in bold, deletions have been struck.)

¶134 The majority's revision not only changes the legislature's explicit statutory language defining a remnant, but it also flies in the face of common sense——the entire property cannot constitute only a remaining part of the property. Throughout its opinion, the majority describes the relevant remnant in this case as "the Wallers' property." See majority op., ¶¶7, 102, 103, 119. If the majority is indeed defining an uneconomic remnant as the entire property, it makes no sense because a remnant necessarily means something that is remaining or left over.

¶135 The common and ordinary meaning of the word "remnant" is "[s]omething left over; a remainder." The American Heritage Dictionary, 1527 (3d ed. 1992). Likewise, the common and ordinary meaning of the statutory word "remaining" contemplates that some property will be "left after the removal, loss, passage, or destruction of others." Id. at 1525. The "remnant" or the "property remaining" cannot mean the whole Waller

4

property——there nothing that is "left over" because the entire property is still intact.

¶136 If the remnant were the entire property, condemnors would be put in the absurd position of having to buy entire properties when the taking leaves the property wholly intact and retaining an economic viability. It substantially inflates the scope of takings required for projects where only easements are necessary, such as the installation of power lines, water or gas pipelines, and the like. In setting forth a definition of an uneconomic remnant, the legislature cannot have intended that a utility company would be forced to buy a whole property in order to install power lines on otherwise existing highway and utility easements.

¶137 Arguably the majority embraces its strained "whole=left over part" analysis because under the facts of this case it also makes no sense that the remnant is the remaining part of the property which is unencumbered by easements. The following illustration, which is not to scale, depicts the previously existing highway and utility easements together with the ATC easements superimposed on top of them:

5



The legislature likewise cannot have envisioned that public utilities would be forced to take fee simple title to the interior part of property as an "uneconomic remnant" while leaving the property owner fee simple title subject to easements in the borders of the property.[2] It would be absurd.

---

[2] The north side of the triangle is abutted by Mound Road. It was previously subject to a 20-foot easement and a 25-foot highway setback. ATC's proposed easement expanded the encumbered area by 25 feet, and would create a 45-foot wide strip of land along Mound Road.

The east side of the triangle abuts Interstate 43 and was previously subject to a 50-foot highway setback. ATC's proposed easement would create a 45-foot wide strip of encumbered property within the existing setback area.

A smaller triangle of land remains unencumbered by easements or setback restrictions after the partial taking. The residence is located on the smaller triangle.

¶138 The second way in which the majority rewrites the statutory definition of the remnant also leads to absurd results. The statute sets forth the "size, shape and condition" test to be applied when determining "substantially impaired economic viability." Wis. Stat. § 32.06(3m). Instead of focusing on the statutory test, the majority makes up its own. It interprets "substantially impaired economic viability" to mean "diminished . . . desirability, practicality, and value." Majority op., ¶7. The majority's emphasis on desirability, practicality, and value causes it to employ a percentage formula in determining whether the Waller property is an uneconomic remnant that at first appears compelling, but ultimately the use of a percentage formula can lead to absurd results. Majority op., ¶85.

¶139 The absurdity is illustrated in the taking of an easement on a highly valued piece of property. Take, for example, a $6 million parcel of land:

¶140 If the value of the property after the partial taking decreases by 57%, as Rolling's appraisal indicated, then the value of the remaining property is $2,580,000.

¶141 If the jurisdictional offer's estimation of the decrease in value is used and the $6 million parcel loses 76% of its value, the remaining property is worth $1,440,000.

¶142 If the Group One appraisal's estimation of the decrease in value is used and the $6 million parcel loses 88% of its value, the remaining property is worth $1,320,000.

7

¶143 Few would argue that a property with an after-taking value of $2,580,000, $1,440,000, or $1,320,000 is an uneconomic remnant of "substantially impaired economic viability," except perhaps in the extreme circumstance where there are other compelling factors present in the facts. Does the majority really mean to employ an analysis that could declare a multi-million dollar property an uneconomic remnant?

¶144 Rather than rewrite Wis. Stat. § 32.06(3m) to fit the Wallers' situation, the majority should stick to applying the words chosen by the legislature. Such a practice would avoid the absurd results described above.

B. **The majority rewrites Wis. Stat. § 32.06(5), the right-to-take statute.**

¶145 The majority tackles the issue of what condemnation proceeding should be used to raise an uneconomic remnant claim—a valuation proceeding[3] under Wis. Stat. § 32.06(7)[4] or a right-

---

[3] The majority refers to the proceeding set forth in Wis. Stat. § 32.06(7) in various ways. At times it calls the proceeding a "valuation proceeding." Majority op., ¶¶70, 92. Other times, it calls the proceeding a "condemnation hearing on valuation." Id., ¶90. In yet other places, it refers to the proceeding as a "just compensation proceeding." Id., ¶67. This opinion refers to such a proceeding as a "valuation proceeding."

[4] Wisconsin Stat. § 32.06(7) states as follows, in relevant part:

> (7) Petition for condemnation proceedings. If the jurisdictional offer is not accepted within the periods limited in sub. (6) or the owner fails to consummate an acceptance as provided in sub. (6), the condemnor may present a verified petition to the circuit court for the county in which the property to be taken is located, for proceedings to determine the necessity of taking, where such determination is required, and the amount of just compensation. . . .

8

to-take proceeding under Wis. Stat. § 32.06(5). Majority op., ¶68. Citing to Wis. Stat. § 32.06(5), the right-to-take statute, it concludes that an uneconomic remnant claim can be maintained only in a right-to-take proceeding. Id., ¶92.

¶146 In reaching this conclusion, however, the majority rewrites the right-to-take statute. As the legislature wrote the statute, it provides, in relevant part:

> (5) Court action to contest right of condemnation. When an owner desires to contest the right of the condemnor to condemn the property described in the jurisdictional offer for any reason other than that the amount of compensation offered is inadequate, such owner may . . . commence an action in the circuit court of the county wherein the property is located, naming the condemnor as defendant. Such action shall be the only manner in which any issue other than the amount of just compensation or other than proceedings to perfect title under ss. 32.11 and 32.12 may be raised pertaining to the condemnation of the property described in the jurisdictional offer.

Wis. Stat. § 32.06(5) (emphasis supplied).

¶147 The Wallers are not contesting the right of the condemnor to condemn——quite the opposite. They want the condmenor to condemn even more property. In an effort to shoehorn the facts of this case into the right-to-take

---

> If the petitioner is entitled to condemn the property or any portion of it, the judge immediately shall assign the matter to the chairperson of the county condemnation commissioners for hearing under s. 32.08. An order by the judge determining that the petitioner does not have the right to condemn or refusing to assign the matter to the chairperson of the county condemnation commissioners may be appealed directly to the court of appeals.

9

proceeding, the majority rewrites the statute by ignoring part of the statutory language.

¶148 The majority erases the portion of Wis. Stat. § 32.06(5) stating that the proceeding is to be maintained when "an owner desires to contest the right of the condemnor to condemn the property described in the jurisdictional offer . . . ." Wis. Stat. § 32.06(5). Despite that clear statement of purpose in the statute, the majority directs future litigants like the Wallers, who do not in any way contest the condemnor's right to take the property described in the jurisdictional offer, to bring uneconomic remnant claims under Wis. Stat. § 32.06(3m) in a right-to-take proceeding.[5]

¶149 All of the legislature's words must be accorded meaning, and here the legislature has stated that a right-to-take proceeding is to be maintained when an owner contests the right of the condemnor to take the property described in the jurisdictional offer. However, the majority appears to delete that language from Wis. Stat. § 32.06(5) in characterizing the right-to-take proceeding as a catchall proceeding for uneconomic remnant claims.

---

[5] The Wallers' attorney stated on the record that there is no challenge to ATC's right to take the property described in the jurisdictional offer:

> In this case . . . this is a case in which we are not challenging their right to take. The only reason we're in that statute [Wis. Stat. § 32.06(5)] is because the statute says the only reason——the only way you can enforce (3m) is under this provision. This is really not a challenge action.

¶150 Additionally, Wis. Stat. § 32.06(5) is rewritten when the majority leaves out other statutory words from its analysis. It emphasizes "any issue," but the statute states in full "any issue other than the amount of just compensation . . . ." By emphasizing "any issue," the majority implicitly holds that an uneconomic remnant claim is not really one of just compensation.

¶151 However, just compensation is at the heart of the uneconomic remnant claim here. The owners want more money.

¶152 Misinterpreting an uneconomic remnant claim as an issue of the right to take rather than an issue of how much compensation a property owner should receive creates a procedural quagmire. Because the majority contemplates that a right-to-take case proceeds concurrently with a valuation proceeding, see majority op., ¶¶92, what happens when the answers reached in each proceeding conflict with each other? Both proceedings require a fact finder to determine the before and after value of the property at issue. When they are in conflict, which valuation trumps the other?

¶153 If the valuation in the right-to-take proceeding trumps the valuation in the valuation proceeding, how does that affect the statutory right to a jury trial in the valuation proceeding? Wisconsin Stat. § 32.06(10) expressly sets forth a statutory right to a jury in a valuation proceeding. It states that a valuation proceeding on appeal to the circuit court "shall be tried by a jury unless waived by both plaintiff and defendant." Id. Is such a statutory right now to be subsumed

11

in favor a judge's determination of value in a right-to-take proceeding?

¶154 Here, the court of appeals held that the jury's verdict in the valuation proceeding must be vacated if the circuit court determined——as it did——that the taking resulted in an uneconomic remnant. Waller v. American Transmission Co., LLC, 2011 WI App 91, ¶17, 334 Wis. 2d 740, 799 N.W.2d 487. Because there is a statutory right to a trial by jury in a valuation proceeding and the jury's verdict is now vacated, does that mean that the valuation proceeding must be retried?

¶155 Is the circuit court's determination on the issue of value in the right-to-take proceeding subject to a claim of issue preclusion in the valuation proceeding? If so, is the denial of the statutory right to a jury trial implicated?

¶156 The condemnation statutory scheme strives for proceedings which are both efficient and cost-effective. Pulvermacher Enterprises, Inc. v. Wisconsin DOT, 166 Wis. 2d 234, 241, 479 N.W.2d 217 (Ct. App. 1991). The majority's conclusion that an uneconomic remnant claim can be brought only in a right-to-take proceeding is contrary to those purposes and potentially creates the procedural quagmire described above.

¶157 This case provides a textbook example of the inefficiencies likely to result from the majority's procedures. Here, the same evidence is so essential to both the question of just compensation and the uneconomic remnant determination that the circuit court incorporated the record and the jury's verdict setting forth before and after values from the valuation

12

proceeding into the right-to-take case. See majority op., ¶36. After the court of appeals reversed the circuit court a second time, concluding that a hearing was necessary to determine whether an uneconomic remnant exists, the same witnesses who testified in the valuation trial were called. They offered essentially the same testimony. See majority op., ¶41.

¶158 Condemnation proceedings are designed not only to provide for an efficient resolution to the question of compensation, but also to provide a cost-effective method of taking property. Pulvermacher Enterprises, Inc., 166 Wis. 2d at 241. In Falkner v. Northern States Power Co., 75 Wis. 2d 116, 248 N.W.2d 885 (1977), even as this court recognized that a right-to-take proceeding is independent from a valuation proceeding, it also observed that "[d]uplication of effort and expense may result if separate trials are held." Falkner, 75 Wis. 2d at 135 n.9. The Falkner court therefore recognized that the condemnation statutes are designed to avoid unnecessary expense incurred by concurrent proceedings.

¶159 In an amicus brief, the Wisconsin Utilities Association provides examples of the added expense that will likely arise due to the condemnation procedures adopted by the majority. It advances that the added expense will ultimately appear in Wisconsin residents' utility bills:

> For example, Wisconsin utilities . . . depend on efficient condemnation procedures to allow them to quickly construct new power lines, gas pipes, and water pipes to meet Wisconsin's growing utility needs. . . . The financial expenses associated with the eminent domain process [] directly impact[s] Wisconsin residents, as the costs of doing business as

13

a utility are largely passed on to customers through rates.

In rewriting Wis. Stat. § 32.06(5), the majority has left in its wake inefficient condemnation proceedings that are more expensive to maintain. The costs of the majority's procedures will be passed on to rate-payers and taxpayers alike.[6]

**C. The majority rewrites Wis. Stat. § 32.28(2)(b), the litigation expenses statute.**

¶160 The litigation expenses awarded by the circuit court total $211,261.74. Majority op., ¶44. In its discussion of litigation expenses, the majority does not even mention the amount awarded by the circuit court. It nevertheless, without analysis of the amount, affirms the entire award as reasonable. Id., ¶¶106-110.

¶161 The error of the majority's sub silencio reasonableness determination is compounded because it has to rewrite a statute in order to affirm this award of out-of-proportion litigation expenses. Wisconsin Stat. § 32.28(3)(b), the litigation expenses statute, provides in relevant part:

(3) In lieu of costs under ch. 814, litigation expenses shall be awarded to the condemnee if:

. . . .

---

[6] The Wisconsin Utilities Association further argues that the provision of utility services such as electricity, gas, and water are "a quintessential public good at stake in the exercise of eminent domain." It advances that "[r]esidents throughout Wisconsin depend on" condemnor-utilities for their utility services, and observes that this court's decision "not only affects the [utilities], it also affects their customers' interests in reasonably priced utility services and sufficient electric, gas, and water distribution infrastructure to support economic development and growth throughout Wisconsin."

(b) The court determines that the condemnor does not have the right to condemn part or all of the property described in the jurisdictional offer or there is no necessity for its taking . . . .

¶162 The majority initially accepts point-blank that the "plain language" of the statute does not allow the majority to award litigation expenses here. Majority op., ¶107. The plain language allows litigation expenses only if "the condemnor <u>does not have the right to condemn</u> part or all of the property described in the jurisdictional offer." Wis. Stat. § 32.28(3)(b). Nevertheless, the majority seemingly ignores the plain language and rewrites the statute by awarding litigation expenses in a case where all agree that ATC <u>has the right to condemn</u> part or all of the property described in the jurisdictional offer. <u>Id.</u>

¶163 An award of litigation expenses is ordinarily authorized by statute and must fit within the relevant statutory grant of authority to justify an award in a given case. Shifting litigation expenses under Chapter 32 is no different——it "is a matter of policy to be determined by the legislature . . . ." <u>Wieczorek v. City of Franklin</u>, 82 Wis. 2d 19, 23, 260 N.W.2d 650 (1978). By applying Wis. Stat. § 32.28(3)(b) to these facts, the majority is rewriting the words of the statute and granting an award of litigation expenses that the legislature did not authorize.

¶164 Ultimately, the ramifications of rewriting Wis. Stat. § 32.28(3)(b) to fit this fact pattern will be felt by the rate-paying public. It is not really ATC that is on the hook for paying the Wallers' disproportionately large litigation

15

expenses. Rather, it is those Wisconsin residents who use electricity that will pay the $211,261.74 bill.

¶165 The amounts in dispute in this case are dwarfed by the Wallers' litigation expenses. Here, ATC offered to purchase the easements for $99,500 in a consensual sale. That offer exceeded the awards of both the compensation commission, which awarded $90,000 for the easements, and the jury, which awarded $94,000 for the easements. In the alternative, ATC conditionally offered to buy the Wallers' entire property for $132,000——the same valuation that the jury ultimately proffered for the Waller property.

¶166 The Wallers rejected ATC's offers. Instead, they took ATC to court. They chose to litigate until the case had seen three circuit judges, the condemnation commission, two panels at the court of appeals, and now the Wisconsin Supreme Court.

¶167 In the end, a jury awarded the Wallers $5,500 less for the easements than what ATC offered to pay in a consensual sale.

¶168 The Wallers' attorneys have without question vigorously and diligently advanced their clients' interests. However, a litigation expenses award of $211,261.74 in a matter where the just compensation award was less than what was initially offered in a consensual sale and where it is undisputed that the condemnor has a right to take the easements at issue is wholly out of proportion to the scale of the dispute.

¶169 The law requires that an award of litigation expenses must be reasonable and necessary. Standard Theatres, Inc. v.

16

Wisconsin DOT, 118 Wis. 2d 730, 741, 349 N.W.2d 661 (1984). In evaluating the reasonableness of proposed litigation expenses, this court has in past cases utilized SCR 20:1.5 as a useful guide. Kolupar v. Wilde Pontiac Cadillac, Inc., 2004 WI 112, ¶24, 275 Wis. 2d 1, 683 N.W.2d 58. One factor to consider under SCR 20:1.5 is "the amount involved and the results obtained." Such an out-of-proportion award is not reasonable under these circumstances, given the "amount involved" and the "results obtained."

¶170 By affirming an award of $211,261.74 in litigation expenses here, the majority is sending the wrong message. Litigants may have little incentive to avoid dragging out small disputes about uneconomic remnants, hoping that future courts will likewise shoehorn their circumstance into the words of the statute and award out-of-proportion litigation expenses.

II

¶171 Our task when interpreting statutes is to discern the statute's meaning, which we presume is expressed in the language of the legislature. Richards, 309 Wis. 2d 541, ¶20. For the reasons set forth above, I conclude that the right-to-take procedure is ill-fitted for an uneconomic remnant determination. It would require rewriting of the statute and results in concurrent, costly, and potentially conflicting procedures.

¶172 The uneconomic remnant determination is about compensation, not the right to condemn. That is especially evident in this case. The Wallers do not challenge ATC's right

17

to condemn. Rather, they seek additional compensation based on the nature of ATC's taking.

¶173 In applying the words of the statutes as written by the legislature, I conclude that Wis. Stat. § 32.06(7) sets forth the correct procedure because it focuses on valuation and compensation. Wisconsin Stat. § 32.06(7) requires that if the condemnor is "entitled to condemn the property or any portion of it, the judge immediately shall assign the matter to the chairperson of the county condemnation commissioners for hearing under s. 32.08." Such a proceeding may be commenced in the circuit court by verified petition "for proceedings to determine the necessity of taking, where such determination is required, and the amount of just compensation."[7] Id.

¶174 Thus, even if an uneconomic remnant claim implicates issues related to the necessity of the taking, Wis. Stat. § 32.06(7) allows for the resolution of those uneconomic remnant claims. Under the statute, the circuit court is expressly empowered to determine the necessity of the taking before referring the matter to the condemnation commission. Wis. Stat. § 32.06(7); see also Wis. Stat. § 32.07(3) (allowing the necessity of a taking to be determined by the court). A "proceeding to determine the necessity of taking" naturally

---

[7] Upon resolution of questions regarding the necessity of a taking, the statute directs the circuit court to refer the valuation question to the condemnation commission. Wis. Stat. § 32.06(7). The condemnation commission is authorized by statute to "ascertain the compensation to be made for the taking of property or rights in property sought to be condemned," but is not otherwise empowered to determine the necessity of the proposed taking. Wis. Stat. § 32.08(5).

18

encompasses uneconomic remnant arguments that implicate the scope of a taking.

¶175 The legislative purpose of the condemnation statutory scheme supports my conclusion. The purpose "is to provide an efficient, final resolution to the compensation question." Pulvermacher Enterprises, 166 Wis. 2d at 241.

¶176 Bringing an uneconomic remnant claim in a valuation proceeding avoids the procedural quagmire identified above. It will encourage questions such as the ones presented here, where the Wallers do not dispute the taking but instead seek additional compensation, to be resolved quickly and efficiently so that just compensation may be addressed with a measure of finality.

¶177 Having determined that a valuation proceeding is the correct way to raise an uneconomic remnant claim, I turn to address whether the Wallers' remaining property after the taking is an uneconomic remnant. Wisconsin Stat. § 32.06(3m) states that a parcel is an uneconomic remnant under two circumstances—when the remnant is of such size, shape or condition so as to be of "little value" or is of "substantially impaired economic viability."

¶178 No one argues on review that the Waller property is of "little value," and because the Waller property has $38,000 in value after the taking, such an argument would be difficult to successfully advance under these facts. Ultimately, the real question is whether the Wallers' remaining property is of such

19

"size, shape or condition" so as to be of "substantially impaired economic viability." Wis. Stat. § 32.06(3m).

¶179 Here, the "size, shape or condition" of the Waller property before the taking indicates that it was a property subject to substantial restrictions. It was a small triangle of land with a residence subject to substantial easements for power lines and setback restrictions, which is situated next to an industrial park and a major interstate highway.

¶180 ATC proposed to take only easements, leaving the Wallers with a fee simple title to the entire parcel. The easements expand upon already-existing easements, and most of the new easements are within an area already subject to setback restrictions.

¶181 Given the nature of the taking in this case and the $38,000 in value left over after the taking, the Wallers have failed to establish that the size, shape or condition of the property remaining after the taking is of "substantially impaired economic viability." Wis. Stat. § 32.06(3m). Under these circumstances, I conclude that after the partial taking, there is no uneconomic remnant.

¶182 Because I determine that there is no uneconomic remnant in this case, I further conclude that an award of litigation expenses and relocation benefits is not justified here. With regard to litigation expenses, the plain text of Wis. Stat. § 32.28(3)(b) allows an award only when the "condemnor does not have the right to condemn part or all of the property described in the jurisdictional offer or there is no

20

necessity for its taking." That circumstance is not present in this case.

¶183 Likewise, relocation benefits are available only if the Wallers meet the statutory definition of a "displaced person" under Wis. Stat. § 32.19(2)(e).[8] That statute requires the Wallers to show that they moved "as a direct result of a written notice of intent to acquire or the acquisition of the real property . . . subsequent to the issuance of a jurisdictional offer." <u>See also</u> Wis. Admin. Code § Adm.

---

[8] Wisconsin Stat. § 32.19(2)(e) provides as follows:

(e)1. "Displaced person" means, except as provided under subd. 2., any person who moves from real property or who moves his or her personal property from real property:

a. As a direct result of a written notice of intent to acquire or the acquisition of the real property, in whole or in part or subsequent to the issuance of a jurisdictional offer under this subchapter, for public purposes; or

b. As a result of rehabilitation, demolition or other displacing activity, as determined by the department of administration, if the person is a tenant-occupant of a dwelling, business or farm operation and the displacement is permanent.

2. "Displaced person" does not include:

a. Any person determined to be unlawfully occupying the property or to have occupied the property solely for the purpose of obtaining assistance under ss. 32.19 to 32.27; or

b. Any person, other than a person who is an occupant of the property at the time it is acquired, who occupies the property on a rental basis for a short term or a period subject to termination when the property is needed for the program or project for which it is being acquired.

21

92.01(14) (further defining "displaced person"); <u>City of Milwaukee v. Roadster LLC</u>, 2003 WI App 131, ¶¶13, 18, 265 Wis. 2d 518, 666 N.W.2d 524 (a lessee was a "displaced person" when it was "forced" to give up its leasehold interest and "forced" to relocate); <u>C. Coakley Relocation Systems, Inc. v. City of Milwaukee</u>, 2008 WI 68, ¶19, 310 Wis. 2d 456, 750 N.W.2d 900 (describing the language in Wis. Stat. § 32.19(2)(e) as applying to a "person displaced by a condemnation").

¶184 The Wallers listed their house for sale in February 2005, one year before they learned of ATC's transmission-line project. Additionally, they lived in their residence for about one year after the upgraded transmission line was installed. Ultimately, I conclude that they do not satisfy the statutory definition of a "displaced person" under these circumstances because they have failed to establish that they moved as a "direct result" of a "written notice of intent to acquire," an "acquisition," or a "jurisdictional offer." Wis. Stat. § 32.19(2)(e).

¶185 Accordingly, I respectfully dissent.

¶186 I am authorized to state that Chief Justice Shirley S. Abrahamson joins this dissent.

22